



FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2004 DEC 27 PM 4: 46

LORETTA G. WHYTE
CLERK

UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA     *    CRIMINAL DOCKET NO.  00-321

v.                          *    SECTION:  "N"

KENNETH RICHMOND          *

                            *   *   *

## GOVERNMENT'S OPPOSITION AND INCORPORATED MEMORANDUM TO DEFENDANT RICHMOND'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE,  SET ASIDE, OR TO CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

**NOW INTO COURT** comes the United States of America through the undersigned Assistant United States Attorney, who opposes defendant Richmond's motion to vacate, set aside, or to correct sentence.

### GIST

Defendant Kenneth Richmond "Richmond" should have received a 40-year sentence for his criminal conduct.  Hard work and the resourcefulness of three attorneys appointed to represent this defendant, without charge, pretrial, at trial, and on appeal, contributed to the imposition of the lesser sentence of 20 years and for that, Richmond should be grateful.

_ Fee_____
_ Process___ ~~pent~~
_X_ Dktd_____
_ CtRmDep__ ~~379~~
_ Doc. No.____

Richmond was caught "red-handed" along with co-conspirators stealing treasury checks and other mail from the United States Post Office on Loyola Avenue in New Orleans, Louisiana. Richmond was also captured on tape setting up the meeting to retrieve the stolen mail from an accomplice. His arrest occurred as he and co-conspirators were attempting to drive away from the post office with 161 treasury checks and 126 letters containing payments to credit card companies that had been delivered to the car by the accomplice.

Richmond had engaged in similar schemes on earlier occasions, but on each later occasion expanded the scope and the sophistication of the scheme. Twice he had been convicted, but he still commenced his most sophisticated fraud, the present scheme, while still serving his sentence on his second fraud conviction.

Richmond's counsel filed pretrial motions, including two *in limine* motions to exclude Rule 404(b) evidence and Daubert motions attempting to exclude the testimony of experts called by the government. While Richmond now claims that he was willing to negotiate a plea, the government was not.

At trial, Richmond's counsel utilized the only defense available to an individual caught red-handed where nine co-conspirators testify against him - "mere presence and lying witnesses with an agenda."

Richmond sought to assist counsel by engaging a co-conspirator, Jerome Nord, to assist in an "extortion and bribery" plot to force Honey Carey ("Carey") to give testimony favorable to the defense. While Carey on direct examination attempted to assume responsibility for criminal conduct ordered by Richmond, she at no time provided perjurious testimony that in any way incriminated the defendant. Only after her letter written to

2

Richmond's co-conspirator post testimony revealed the scheme to assist Richmond, did the government through its investigation learn of the monies paid to Carey in her commissary account and the threats made to her sisters to frighten her from testifying.

Yet, defense counsel dutifully filed a motion for a new trial on the basis of Carey's "false" testimony but certainly did not want an evidentiary hearing once the affidavits were filed by the sisters of Carey exposing Richmond's obstruction of justice activities.

On appeal, his counsel raised five alleged errors relating to the denial of the new trial, admission of the Rule 404(b) evidence and granting the upward departure. Even though the United States Supreme Court in Almendarez-Torres v. United States, 523 U.S. 224 (1998) exempted prior convictions for enhancing a sentence from the general rule articulated in Apprendi v. New Jersey, 530 U.S. 466 (2000), counsel preserved for the record the argument that an enhancement of a statutory maximum sentence on the basis of a prior conviction should be a jury issue and not a judge's sentencing issue. 15 R30236, 120. Counsel also filed a reply brief, and once the appeal was denied, filed a request for a panel rehearing.

On the 404(b), new trial, and upward departure issues, the appellate court both refused to remand the matter for an on the record Beechum analysis on the 404(b) issue or an evidentiary hearing on the new trial request and ruled on the merits of the underlying issues, concluding that the Rule 404(b) evidence was properly admitted as to all charged offenses and that the new trial motion could not have prevailed because Carey's alleged "false testimony" could not "probably produce an acquittal."

Richmond, with more than a year to strategize, now presents a hodge podge of allegations shamelessly attacking the competency and the effectiveness of his counsel with

3

accusations that contradict one another, allegations that blatantly misrepresent the facts, and arguments that ignore the fact that the Court of Appeals ruled against him on the merits of the underlying issues and not purely on the remand request of the defense.

Richmond recognizes under the stringent standards of Strickland v. Washington, 466 U.S. 668 (1984), that to satisfy the prejudice prong of the two-part test, a defendant must establish that his counsel's deficient performance resulted in an unreliable or fundamentally unfair outcome of the proceedings. Lockhart v. Fretwell, 506 U.S. 364 (1993), Richmond's Memorandum, p.4. He in effect concedes that his convictions were proper and that he committed the charged offenses when he argues in Issue II that his counsel improperly refused to allow him to enter a plea of guilty and urges in issue VII that his counsel should have conceded his criminal knowledge and criminal intent to the charged offenses to remove the Rule 404(b) evidence as an issue. Richmond cannot have it both ways; admitting his guilt, his criminal knowledge and intent, undercuts any suggestion that counsel's alleged "ineffectiveness" resulted in a fundamentally unfair outcome in the proceedings.

## **LEGAL**

A valid claim for ineffective assistance of counsel requires petitioner to demonstrate both prongs of the test set forth in Strickland v. Washington, 466 U.S. 668 (1984). Petitioner must show: (1) his counsel's performance was deficient; and (2) his counsel's deficient performance prejudiced his defense. Id. at 687.

In evaluating an ineffective assistance of counsel claim, the Court need not address the two Strickland prongs in order, or even address both of them. If the Court finds that a petitioner has made an insufficient showing at either one of the two stages of inquiry, the

4

Court may dispose of the claim without addressing the other stage. See Strickland, 466 U.S. at 697.

A finding of ineffective assistance "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. "The proper standard for judging attorney performance is that of reasonably effective assistance, considering all the circumstances." Id. "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689.

Accordingly, the Court engages in a "strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 690 (internal quotation marks omitted). Richmond can show neither deficiency in performance nor prejudice.

## SUMMARY OF RICHMOND'S ISSUES
## AND THE GOVERNMENT'S RESPONSE

| ALLEGATIONS | | |
|---|---|---|
| No. | Defense's Argument | Government's Argument |
| 1 | Blakely v. Washington, 124 S.Ct. 2531 (2004) applies to Richmond, requiring a new trial as to all upward departure and sentencing enhancements found by the judge. | United States v. Pineiro, 377 F.3d 464 (5th Cir. 2004) held that Blakely has no bearing on the Federal Sentencing Guidelines; even if Blakely impacts the guidelines, the new rule requiring a jury and not the judge to decide all facts impacting a sentence is a Rule of Criminal Procedure, has no impact on the actual guilt of the defendant, does not implicate the fundamental fairness of the proceeding, and therefore is not retroactively applied to defendant's habeas corpus petition. |

| ALLEGATIONS | | |
|---|---|---|
| **No.** | **Defense's Argument** | **Government's Argument** |
| 1a | Counsel failed to urge that the Apprendi rule applied to all fact finding by the judge that impacted the defendant's sentence. | Because no circuit court had concluded that the Federal Sentencing Guidelines violated the Sixth Amendment right to have the jury determine sentencing enhancements and upward departures, counsel could not be ineffective in failing to raise the argument, especially since the Fifth Circuit Court of Appeals has concluded that Blakely does not apply to the Federal Sentencing Guidelines. |
| 2 | Counsel mislead the defendant about his maximum sentence exposure and thereby chilled the defendant's opportunity to enter a plea of guilty. | In a letter to defendant Richmond, his counsel explains that the government would soon supersede the indictment and that the maximum penalty for any of the particular offenses would increase from five years to 20 years thereby undercutting any claim of a misrepresentation by counsel. |
| 3 | Counsel failed to request an evidentiary hearing to resolve defendant's motion for a new trial. | The Court of Appeals concluded that the witness testimony was exculpatory, not inculpatory, and thus, if corrected, could not "probably produce an acquittal," thereby rejecting on the merits the motion for a new trial. |
| 4 | The prosecutor violated due process by failing to correct the perjured testimony of the witness. | Any possible "false" testimony was exculpatory by design of the defendant but the government certainly did not attempt to strategically take advantage of any "false" testimony at the trial. |
| 5. | Defense counsel failed to require the court to make an on-the-record Beechum analysis. | The District Court made the Beechum analysis in a written opinion rejecting the defense's in limine motion to exclude Rule 404(b) evidence, the Court of Appeals found that the District Court properly applied the Beechum test, and ultimately concluded that the Rule 404(b) evidence was properly admitted with the limiting instructions as to the substantive and conspiracy offenses.  (5th Cir. Opin. 12-14). |
| 6 | Counsel failed to object to the use of the Rule 404(b) evidence as to the substantive charges. | The Court of Appeals concluded that the District Court properly allowed the introduction of the Rule 404(b) evidence as to the conspiracy and substantive offenses and gave proper limiting instructions.  (5th Cir. Opin.12-14, para. 5). |
| 7 | Counsel failed to remove as issues defendant's criminal knowledge and criminal intent to commit the charged offenses so that Rule 404(b) would not apply. | Because conceding knowledge and criminal intent would have been an admission of guilt to the charged offenses, defense counsel were not ineffective pursuing a defense. |
| 8 | Counsel on appeal failed to urge that the Rule 404(b) evidence should not have been admitted as to the substantive fraud offenses and that no general limiting instruction should have been given. | While Appellate counsel did urge that Rule 404(b) evidence should not have been admitted as to any offense and challenged the Beechum analysis, the Court of Appeals concluded that the "other offense evidence" passed the Beechum test and was admissible as to the conspiracy and the substantive  offenses.  (5th Cir. Opin.12-14). |

| | ALLEGATIONS | |
|---|---|---|
| **No.** | **Defense's Argument** | **Government's Argument** |
| 9 | Counsel failed to object to the "in and itself" language in the "accomplice" jury instruction. | The jury was never told that the accomplices plead guilty to the conspiracy offense in which the defendant was charged and no argument by the prosecution was made that the jury should have considered the accomplice pleas of guilty as evidence of defendant Richmond's guilt. |
| 10 | Counsel failed to object to the leadership role enhancement since defendant was only charged as an aider and abettor. | Defendant Richmond was charged as both a conspirator and a principal in every substantive offense, and the proof at trial and the sentencing hearing established that he was a leader and an organizer under to U.S.S.G. § 3B1.1. |
| 11 | Counsel was ineffective for not urging that the Section 371 General Conspiracy Offense and the substantive offenses (predicate offenses to the conspiracy) were multiplicitious and violated the double jeopardy clause. | The law has firmly established that a general conspiracy charge and the underlying substantive offenses are neither multiplicitious nor a violation of the double jeopardy clause. |
| 12 | The court should consider the cumulative errors and conclude that Richmond's Fifth Amendment right to effective assistance of counsel has been violated. | Defendant was unable to demonstrate that any of the alleged conduct of his counsel or government counsel has resulted in a fundamentally unfair outcome of the proceedings since he has conceded his guilt in issues II and VII and nowhere in his memorandum does he contest the underlying facts establishing his guilt, the sentencing enhancements, and the grounds for an upward departure nor does he present any legal or factual argument otherwise. |

I.    **Course of Proceedings Below**[1]

    A.    **Prosecution of Conspiracy to Commit Multiple Frauds and Substantive Counts**

       Defendant Richmond and co-conspirator Kieffer were arrested together on September 29, 2000.  Ultimately, Richmond, Kieffer and nine other defendants were

---

[1] References to Record on Appeal, Appeal Nos. 01-31099, 01-31101 and 02-30236 of this matter are abbreviated "____ *R31099,* ____", "____ *R31101,* ____" and "____ *R30236,* ____" indicating volume number, Appeal No., and page number, respectively.

References to Richmond's brief are designated as "**RBr**.____" indicating page number.

References to the Fifth Circuit Opinion are designated as "**5ᵗʰ Cir. Opin.** ____" indicating page number.

References to Richmond's Presentence Reports are designated as "**RPSI.97-150,** ____"; "**RPSI.97-376,** ____"; and "**RPSI.00-321,** ____" indicating page number.

References to government's Exhibits are designated as "**GEX.** ____" indicating exhibit number.

indicted in a multi-count indictment in 00-321. 2 R30236, 194. In the final superseding indictment, Richmond was charged with conspiring to create counterfeit drivers' licenses and counterfeit credit cards, to steal mail, and to commit bank fraud, in violation of 18 USC § 371. Richmond was also charged with substantive counts of attempted mail theft in violation of 18 USC § 1708, possession of false identification documents in violation of 18 USC § 1028(a)(3) and possession of 15 or more counterfeit access devices with intent to defraud in violation of 18 USC § 1029(a)(3). 3 R30236, 334.

Before trial, Richmond moved in limine to exclude: (1) evidence of his 1997 and 1998 convictions, (2) evidence relating to the murder of a co-conspirator, and (3) evidence relating to the forging of a real estate closing document. 2 R30236, 64; 3 R30236, 471. The government filed an opposition. 3 R30236, 451. The district court allowed admission of evidence of the 1997 and 1998 convictions pursuant to Fed. R. Evid. 404(b), but excluded evidence relating to the murder and the forged real estate document. 3 R30236, 397.

Nine of Richmond's co-defendants pleaded guilty to the indictment in 00-321. The remaining defendants, Richmond and Kieffer, along with Richmond's sister Karen, went to trial. After a four day trial before United States District Judge Edith Brown Clement, the jury convicted all three defendants on all counts. 3 R30226, 318.

After trial, the government intercepted a letter written by incarcerated co-defendant and trial witness Honey Carey ("Carey"), in which she claimed to a co-conspirator that she minimized Richmond's role in the conspiracy at trial in order to protect him 3 R30236, 275. The government immediately produced the letter to the district court and to the defendants. 3 R30236, 274. Richmond filed a motion for a new trial claiming perjured testimony by a

8

witness. 3 R30236, 279. The government filed an opposition to the motion for a new trial and submitted supporting affidavits. 4 R30236, 590. Nine days later, on January 31, 2002, the district court entered its Order and Reasons denying the motion for a new trial. 3 R30236, 546.

Richmond filed objections to his presentence report including an objection to his "leadership" role in the offense and specific objections to the report's reference to possible upward departure grounds. The district court ordered the government to respond to those upward departure objections. 4 R30236, 525, 535, 523. The government discussed the overall harm and disruption of governmental function caused by the criminal organization, the murder of a co-conspirator, the repetitive conduct to obstruct justice, and Richmond's recidivism in the memorandum. 4 R30236, 511. In the final presentence report filed with the district court, the probation officer made revisions to the report on the upward departure issues. RPSI.00-321, 23-26.

The government filed formal motions for upward departures from the Sentencing Guidelines of Richmond and Kieffer. 1 R30236, 48; 4 R30236, 551. Richmond's counsel filed an opposition. 1 R30236, 40; 4 R30236, 525.

On February 20, 2002, the district court conducted a several hour long sentencing hearing that addressed the government's upward departure motions, including the legal reasons for those motions and evidence supporting the departure positions. 3 R30236, 501; 15 R30236, 1-116. The district court granted, in part, the government's motion to upwardly depart on Richmond's sentence, and imposed a 240 month term of imprisonment as to Count 6, 120 month term of imprisonment as to Count 9, and 60 months for both Counts 1 and 2 of the third superseding indictment, all terms to be served concurrently.

9

15 R30236, 121-31. The district court ordered the terms of imprisonment to run consecutively to Richmond's imprisonment on the revocation sentences. Richmond was also placed on concurrent three year terms of supervised release that ran concurrently to the one year term of supervised release in the revocation sentences. 4 R30236, 489; 15 R30236, 121. Timely appeal was filed by Richmond from the conviction and sentence. 4 R30236, 495; 1 R30236, 19.

## B.     Facts Surrounding Crimes and Present Indictment

Richmond has been convicted three times of crimes involving identity theft. In late 1999, while still serving the final months of his sentences in a halfway house for his previous two convictions in 97-150 and 97-376, Richmond recruited postal service employee Jones to steal mail from the United States Post Office on Loyola Avenue, New Orleans, Louisiana. 8 R30236, 117-22.

In their initial meeting, Richmond showed Jones his equipment for creating false Louisiana drivers' licenses including a digital camera and computer. He asked her to steal personal checks from the post office so that he could match them with the false identification. 8 R30236, 121; 10 R30236, 170-71. Once she demonstrated that she could steal the mail, Richmond broadened his request from personal checks to treasury checks and then to credit card bill payments. 8 R30236, 127, 138-39.

Jones, at Richmond's request, would routinely secret the stolen mail in her lunch pail for delivery at a pre-arranged location in exchange for later payment by Richmond. 8 R30236, 127, 130. When treasury checks were plentiful at the post office at tax time, from February 2000 through April 2000, Jones routinely stole treasury checks and delivered them to Richmond. 8 R30236, 128. Richmond had several bases of operation

10

over the course of the conspiracy, so Jones delivered the stolen mail to different locations including a rented apartment, Richmond's apartment complex, and Richmond's liquor store. 8 R30236, 125, 131, 133.

On a number of occasions, Richmond came to Jones to retrieve the stolen mail. Kieffer, Richmond and co-conspirator Leo Stevens once drove to Jones' house to pick up the stolen mail. 8 R30236, 133-35. Jones testified: "They came to my house and I stood on the outside and gave them the bills." 8 R30236, 136.

Several times, Richmond drove to Loyola Avenue and parked in a specified location in front of the post office. 8 R30236, 135. Jones brought the stolen mail from the post office in her lunch pail, entered the car and delivered the mail to Richmond. On several occasions, Kieffer was with Richmond when Jones delivered the mail to Richmond. 8 R30236, 136. Of the times that Kieffer came with Richmond to Loyola Avenue, Jones remembered one specific time when Kieffer was in a white sport utility vehicle with Richmond and she delivered the mail to the car. 8 R30236, 136-37.

Jones met many of the members of the Richmond organization, including the co-conspirators responsible for cashing the checks using fraudulent licenses at banks or commercial establishments. 8 R30236, 141-47, 175-77. Richmond recruited, trained and paid a large group of people to negotiate the forged checks and use the counterfeit-credit cards. Seven members of Richmond's organization testified about a highly organized and regimented operation, where members reported for work on a regular schedule, three or more days a week, were required by Richmond to adhere to a prescribed dress code to avoid detection, and were assigned a pre-bundled package containing a certain number of checks to negotiate on a given day, together with fraudulent Louisiana drivers' licenses.

11

9 R30236, 91-95; 10 R0236, 227-29, 297-299, 350.  At the end of the day, each member reported back with her fraudulent gains.  Richmond generally kept about one-third of the proceeds, postal worker Jones received one-third and the person cashing the checks received one-third.  9 R30236, 92; 10 R30236, 227.

Richmond took Jones to a house in Algiers, Louisiana, where he showed her his credit card manufacturing equipment. 8 R30236, 147. Richmond had a laptop computer, an embossing machine and a leather bag that contained blank credit cards, estimated about 10 in number. 8 R30236, 148; 10 R30236, 170.  He made a credit card on the equipment, copying the access numbers off a bill that was available. 8 R30236, 148-49.

Jones learned that the Richmond organization obtained new vehicles by using false identification to rent these vehicles.  Richmond told her that he had a friend at a dealership who was assisting his group.  8 R30236, 150-51.  Other co-defendants testified that Richmond had them travel to a Ford dealership in Jackson, Mississippi, where they used a false drivers' license and credit information to lease six new Ford vehicles, including an Explorer and an Expedition.  A dealership employee received a bribe of $1000.00 to conduct the transactions, $500.00 of which came from Richmond. 9 R30236, 106-09; 10 R30236, 233-37.

Co-defendant Kimberly Taylor confirmed that Kieffer and Richmond took advantage of the fraudulently leased new cars. 10 R30236, 233-34.  Richmond drove a F150 Ford truck and Kieffer drove a black Ford Expedition, the same vehicle that Richmond and Kieffer drove to Texas for a check-cashing and credit card shopping trip. 10 R30236, 233-35.

12

Jones learned from Richmond that she was not the only source for stealing personal checks; a postal carrier in Kenner, Louisiana, was also supplying checks to the organization. 8 R30232, 149-50.

Jones overheard a conversation between Richmond and Kieffer where they discussed cashing stolen checks at check-cashing machines in Texas. They even gave her a pamphlet to show her the machine. 8 R30236, 152; 9 R30236, 110-12. Co-defendant Kimberly Taylor testified that on this same trip, Richmond, Kieffer and the other women each used counterfeit credit cards to shop at a mall. 10 R30236, 230-32.

Richmond counterfeited and taught co-defendant Carey to counterfeit Louisiana drivers' licenses, using a digital camera, a laptop, plastic drivers'-license sleeves stolen from the Louisiana Department of Motor Vehicles, and a laminator. 9 R30236, 73, 84-86, 105; 10 R30236, 343. Carey testified at trial that Richmond gave her stolen mail, including boxes of personal checks, credit card bill statements, and government checks. 9 R30236, 80-81. Carey sorted the mail, and as instructed by Richmond, telephoned various banks and credit card companies to verify checking account and credit-card balances. 9 R30236, 82-83, 89-90.

From the stolen credit-card bill payments, the Richmond organization used the credit-card access-device numbers to create counterfeit credit cards, and used the information (account number and account holder) from the personal checks written to the credit-card companies to cash the stolen blank personal checks. 9 R30236, 89-90. After verifying the account balance, Richmond and Carey created a false Louisiana drivers' license in the name of the account holder with a co-conspirator's photograph. 9 R30236, 91, 105-06. That co-conspirator cashed the personal checks at the bank of the account

13

holder after the account holder's name was used as the payee on the stolen check. 9 R30236, 91-93.   Stolen personal checks were cashed in almost every parish in Louisiana. 9 R30236, 94-95.

Carey had access to Richmond's credit-card manufacturing equipment and was taught by Richmond to create these fraudulent cards.  9 R30236, 82-83, 99-104, 151. Richmond not only made cards himself, but at least three times a week had Carey make drivers' licenses and credit cards for the organization. 9 R30236, 161-62.  Richmond and Carey discussed  which workers were going to cash the checks, who needed a false ID, and what credit cards needed to be made.   9 R30236, 162-63.  Richmond possessed approximately 100 blank credit cards with company logos at one time.  9 R30236, 102; 10 R30236, 342.

By the time United States Postal Inspectors ("Inspectors") apprehended postal worker Jones on September 29, 2000, with 161 treasury checks and 126 stolen credit-card bill payments, the conspiracy had expanded to multiple areas of fraud including: (1) the theft and forgery of personal checks, (2) the theft and negotiation of treasury checks, (3) the theft of access numbers and creation of counterfeit credit cards, (4) the theft of personal-identification information used to create false Louisiana drivers' licenses with computer software, and (5) the fraudulent leasing of new automobiles.

When arrested, Jones ultimately cooperated  and recorded a telephone call with Richmond wherein Richmond agreed to meet Jones at the post office to "pick this up" and pay her $1,000.00. 8 R30236, 160-63.  Richmond and Kieffer parked exactly where Jones said they would, and Jones, while under surveillance, entered the automobile with her lunch pail, left it sitting next to Kieffer who was in the back seat, and then received the

14

thousand dollars from Richmond. 8 R30236, 164-65; 11 R30236, 71. After Jones left the car with her lunch pail still inside, Richmond and Kieffer pulled from the curb to drive away but were stopped by Postal Inspectors. The Inspectors made a video recording of Jones' delivery of the lunch pail and the ultimate arrest of Richmond and Kieffer. 8 R30236, 166-68.

The full financial cost of the Richmond conspiracy will never be determined. Jones repeatedly stole mail for the Richmond organization without noting the identity of those victimized by the thefts. The Inspectors were able to apprehend co-conspirators identified by Jones and, through their cooperation, to identify some of the many banks and establishments where treasury and personal checks were cashed. 11 R30236, 80-83. The forged personal checks identified as part of the scheme alone totaled $449,000. The Inspectors had to rely on bank surveillance photographs and handwriting and fingerprint forensics to further identify checks cashed by members of the Richmond organization. 9 R30236, 32-34.

The Richmond organization operated for almost eight months and co-conspirators testified to seeing large bundles of treasury checks and credit card bill payments repeatedly delivered by Jones to the various apartments, but the Inspectors using the limited investigative techniques discussed above were only able to retrieve 35 treasury checks and 22 counterfeit credit cards in addition to the items seized from Jones at her arrest. 11 R30236, 87-88; 10 R30236, 170-71, 218, 342.

Inspectors determined that several of the counterfeited cards had been used to their maximum credit limits. 11 R30236, 85-86. Taylor testified that when she initially

participated with Richmond in a credit fraud at a Circuit City store, she made sure she used the maximum credit limit. 10 R30236, 214-15; 11 R30236, 85.

A forensic expert in comparisons and microscopic examinations of tool impressions and tool marks concluded that 15 of the counterfeit cards seized by the Inspectors from co-conspirators were created by the same embosser, based on the identical imprints on each card as shown by microscopic examination. 11 R30236, 47-61; GEX. 4.

Postal Inspector Michael Paulus identified the fraudulent drivers' licenses seized from co-conspirators, and described the unique counterfeit characteristics (incorrect audit numbers) further establishing that the licenses were created from the same computer program. 11 R30236, 75-76; GEX. 21(d). Paulus identified distinguishing characteristics on the seized credit cards that supported the forensic testimony. 11 R30236, 77-78. The Inspector introduced the receipt for the credit card embosser that was purchased in Beaumont, Texas by co-defendant Dana Maxwell who testified that it was delivered by co-conspirator Larry Moore to Richmond. 11 R30236, 80-81; 10R30236 167-170; GEX 15.

Of the items seized from Jones, the 161 treasury checks had an total value of approximately $84,500.00. Of the 126 credit card access numbers seized from Jones, Paulus was able to verify the credit limits on 58 of those cards which was approximately $263,000.00. 11 R30236, 85-99; GEX. 1 in globo, charts 1-4; 4 R30236, 503-07; and GEX. 21a-f.

Paulus also provided the only brief testimony about Richmond's two prior felony convictions, describing Richmond's criminal conduct as using counterfeit Louisiana drivers' licenses created by a computer in conjunction with forged securities. 11 R30236, 90.

## C.    Facts Relevant to Sentencing Hearing

At the sentencing hearing, the government focused on the following grounds for upward departure raised in the motions: (a) the estimated size of the monetary losses caused by the organization, (b) the overall harm caused by the Richmond organization as a result of the multiple objects of the fraud and the victim groups targeted, (c) the disruption to governmental function caused by the operation, (d) the murder committed to settle a turf war between Richmond and a co-conspirator, and (e) the repetitive efforts by Richmond to obstruct the investigation and prosecution of his case. 15 R30236, 1-78, 79-121.

Inspector George Brown testified that Jones confessed to stealing treasury checks two to three times a week during a four-month spree from February through May 2000.[2] 15 R30236, 7. In September 2000, Jones stole additional treasury checks two to three times. When she was arrested on September 29, 2000, Jones was caught with 161 treasury checks. She admitted that on each previous occasion, she likewise took a handful of treasury checks and placed them in her lunch pail. Brown calculated conservatively that on approximately 35 occasions, Jones stole treasury checks for the Richmond organization of approximately the same quantity and value. 15 R30236, 8-11; GEX. 1 in globo, charts 1-4.

Brown calculated, based on Jones' information, that on at least 13 occasions, she stole credit card bill payments from the Post Office in a quantity that she believed was about two-thirds the quantity of the bill payments stolen on September 29. 15 R30236, 10.

The value of the personal checks seized by the Inspectors totaled $449,000. Even though a co-conspirator  testified that she cashed checks in almost every parish in

---

[2] In preparation for the hearing, Brown reviewed the trial testimony of Jones and re-interviewed her. 15 R30236, 6.

Louisiana, Brown stated that because of the size of the investigation, Inspectors focused primarily on those banks in and near the New Orleans and Baton Rouge, Louisiana, metropolitan areas.[3] 15 R30236, 13; 9 R30236, 94.

As set forth above, the Richmond organization was able to "work" the entire State of Louisiana because they had a fleet of fraudulently leased vehicles. The value of the six vehicles fraudulent leased from the Ford dealership in Jackson, Mississippi, was approximately $187,000.00. A seventh vehicle, an Explorer, leased from a New Orleans dealership was valued at $21,000.00. Richmond and Kieffer were in a stolen 1993 Suburban the day they were arrested. Carey was driving a stolen 1999 Jeep Grand Cherokee when she was arrested. 15 R30236, 17-18, 80-81; see GEX. 1 *in globo*; 11 R30236, 31.

Jones also told Brown that on the five or six occasions prior to September 29 in which Kieffer accompanied Richmond to pick up stolen mail, she removed the mail from her lunch pail and delivered the stolen mail in Kieffer's presence. 15 R30236, 26-27.

Postal Inspector Brown testified that the bulk of the stolen treasury checks were tax refunds from the Internal Revenue Service, Social Security checks to retirees or the disabled, and benefit checks to veterans paid through the United States Veterans Administration. Brown described the disruption caused to those federal agencies which issued the treasury checks as well as the disruption to the United States Postal Service (including internal and external investigations), from which the checks were stolen. He also outlined the further harm visited on the individual victims, including delayed Social Security

---

[3] During the course of the conspiracy, Richmond had three different postal employees stealing personal checks from the Post Office. Brown also testified that there were several other conspirators in the organization beyond those persons who were indicted with Richmond. 15 R30236, 14-15.

and veterans' benefits, stolen identities, canceled bank accounts, and the losses caused to businesses which cashed the stolen treasury checks and to banks which cashed the forged personal checks. 15 R30236, 28-38.

Brown described the efforts by Richmond and co-conspirators to obstruct justice in an attempt to thwart the investigation and prosecution. Carey's sisters were told via telephone by Richmond and co-conspirator Kenneth Nord that Carey should keep her mouth shut. Richmond insinuated violence when he told the sisters that he would turn on Carey if she continued to cooperate. Nord told one sister that Richmond had a "hit man" who worked for Richmond and that he could "take care of business."[4]  The sisters overheard telephone conversations between Carey and Richmond in which he screamed at her, she cried and he demanded that she not plead guilty. 15 R30236, 39-49.

Along with the threats, Richmond and Nord used bribery. Richmond caused Nord to send money to the sisters to pay for his three-way-telephone calls and Honey Carey's baby. Nord offered one of the sisters $1,500.00 if she would pick up some "equipment" that he was holding in Houston, but she refused. On three occasions, Nord caused $200.00 to be deposited into Carey's commissary account at the New Orleans jail where she was incarcerated. The last $200.00 payment was made on September 24, 2001, the day the Richmond trial started. All money payments ceased after Carey testified in the Richmond trial. 15 R30236, 44-47.

Brown also recounted the following obstruction efforts by Richmond. When the Inspectors were trying to locate co-conspirator Taylor, Richmond called her in Atlanta,

---

[4] The murder contract on Larry Moore, described above, was carried out by a "hit man."

19

Georgia, and told her to "lay low." On September 29, 2000, after his arrest, Richmond saw

Jones in the holding cell area and told her "don't say nothing." 15 R30236, 49.

Richmond told co-conspirator Lester Wheeler that Richmond was "going to go all

the way to the door" (of the courthouse) with the trial so that he could find out who was

going to testify against him, and then "he would do them something." 15 R30236, 48.

Inspector Paulus testified that Darryl Jones confessed to being a hit man for

Richmond. Jones was hired by Richmond to commit the murder and was paid $12,000.00.

11 R30236, 82-101.

## ISSUES

### I.    Blakely Has No Application to Richmond's Case

Richmond's conviction became final after the denial of his petition for rehearing on

July 10, 2003. Blakely was decided on June 24, 2004, well after Richmond's judgment had

become final.

When a Supreme Court decision announces a new rule, the new rule will apply to

all criminal cases still pending on direct review. Griffith v. Kentucky, 479 U.S. 314, 328,

107 S.Ct. 708, 93 L.Ed.2d 649 (1987). As recognized in Teague v. Lane, 489 U.S. 288,

109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), however, "[u]nless they fall within an exception

to the general rule, new constitutional rules of criminal procedure will not be applicable to

those cases which have become final before the new rules are announced." 489 U.S. at

310, 109 S.Ct. at 1075. One exception to the Teague rule arises if the new rule is

substantive, that is, the ruling serves to "narrow the scope of a criminal statute by

interpreting its terms." Schriro v. Summerlin, ___ U.S. ___, 124 S.Ct. 2519, 2522 (2004)

(other citations omitted). A new rule which is deemed substantive is applicable

20

retroactively on collateral view because failure to give retroactive application create[s] "a significant risk that a defendant stands convicted of 'an act that the law does not make criminal' or faces a punishment that the law cannot impose upon him." Bousley v. United States, 523 U.S. 614, 621 (1998) (other citations omitted).

To be substantive and, therefore, to have retroactive effect, a new rule must be a "watershed rule" "implicating the fundamental fairness and accuracy of a criminal proceeding" "without which the likelihood of an accurate conviction is *seriously* diminished." Schriro, 124 S.Ct. at 2523 (emphasis in original)(other citations omitted). Substantive rules "alters the range of conduct or the class of persons that the law punishes." Id. (other citations omitted). "In contrast, rules that regulate only the *manner of determining* the defendant's culpability are procedural." Id. (emphasis in original)(other citations omitted).

Utilizing this standard, Schriro held that the decision in Ring v. Arizona, 536 U.S. 584 (2002), requiring that in a capital case, the existence of an aggravating factor warranting the death penalty must be proved to a jury, rather than a judge, announced a procedural rule not retroactively applicable to cases already final on direct review.[5] Schriro, 124 S.Ct. at 2523, 2526. Similarly, United States v. Brown, 305 F.3d 304 (5th Cir. 2002), held that the rule in Apprendi v. New Jersey, supra, dictating that drug quantity is not a sentencing enhancement, but an element of a drug offense which must be found by a jury

---

[5] Blakely, supra, and Shriro, supra, were decided the same day and both opinions were authored by Justice Scalia. In Shriro, id., the court refused to retroactively apply its decision in Ring, supra, where the court applied the principals of Apprendi to an Arizona death sentence. "Judged by this standard, Ring's holding is properly classified as procedural." at 2523. Ring held that "a sentencing judge, sitting without a jury, [may not] find an aggravating circumstance necessary for the imposition of the death penalty." (citations omitted). at 2523. Likewise, the court in Blakely, supra, applied the Apprendi principles to Washington State sentencing guidelines. In both Ring supra, and Blakely, supra, the issue related to whether a judge or a jury had to decide the existence of facts that had a direct impact on sentencing. Thus, both cases articulated rules that regulate only the manner of determining the defendant's culpability and were thus procedural and not retroactive. At 2526.

beyond a reasonable doubt, is procedural and, therefore, not applicable to initial § 2255 petitions. Brown, 305 F.3d at 310.

Applying the Schriro method of determining whether a rule is substantive or procedural, it is patent that the new rule announced in Blakely is procedural. Blakely is based upon Apprendi principles and it governs the manner in which the sentencing judge determines the facts upon which to base the defendant's sentence, i.e., by jury verdict or by defendant's admission. Because it is a procedural rule without retroactive application, the petitioner is foreclosed by Teague from raising an alleged Blakely violation in a § 2255 motion seeking collateral relief.

Furthermore, in United States v. Pineiro, 377 F.3d 464 (5th Cir. 2004), the Fifth Circuit held that "[j]udicial findings under the [United States Sentencing] Guidelines that set sentences within [range of punishments defined and authorized by Congress in the United States Code] . . . do not offend the Constitution," declining to apply Blakely to the federal Sentencing Guidelines.  377 F.3d at 473.[6]

Blakely affords no relief to the defendant because it does not apply retroactively to petitions for collateral relief nor has the Fifth Circuit Court of Appeals found it to be applicable to the United States Sentencing Guidelines.  For the above reasons, the

---

[6] What the Supreme Court has "already held" about the Guidelines, therefore, continues to provide the governing principles for the district court; i.e., the Sentencing Guidelines are constitutional because "Congress neither delegated excessive legislative power nor upset the constitutionally mandated balance of powers among the coordinate Branches," see Mistretta v. United States, 488 U.S. 361, 412 (1989); so long as a sentence does not exceed the statutory maximums established by Congress for the offense of conviction, a Guidelines sentence can (in fact, sometimes must) be based on judge-found conduct not proven to a jury, see Edwards v. United States, 523 U.S. 511, 514-15 (1998), conduct not charged in the indictment, see Witte v. United States, 515 U.S. 389, 399-401 (1995), and conduct of which a defendant is acquitted but is established by a preponderance of the evidence, see United States v. Watts, 519 U.S. 148, 156-57 (1997)(per curium).  Moreover, the Supreme Court has held that courts are bound not only by the Guidelines, but by their policy statements and commentary as well.  Stinson v. United States, 508 U.S. 36, 42-47 (1993).

22

government asks the court to deny defendant Richmond's request to vacate his conviction on the basis of Blakely, supra.

## Ia. Counsel Not Required to Predict the Pronouncement in Blakely Before the Decision Issued

Not only had all the circuits consistently upheld the Guidelines against constitutional attacks and underscored their unique status within our constitutional scheme, but all the Court of Appeals, including the Fifth Circuit, had unanimously held, at the time that Richmond's conviction became final, that the Federal Sentencing Guidelines do not violate the rule of Apprendi. See United States v. Floyd, 343 F.3d 363, 372 (5th Cir. 2003); United States v. Casas, 356 F.3d 104, 128 (1st Cir. 2004); United States v. Luciano, 311 F.3d 146, 153 (2d Cir. 2002); United States v. Parmelee, 319 F.3d 583, 592 (3rd Cir. 2003); United States v. Cannady, 283 F.3d 641, 649 & n.7 (4th Cir. 2002); United States v. Tarwater, 308 F.3d 494, 517 (6th Cir. 2002); United States v. Merritt, 361 F.3d 1005, 1015 (7th Cir. 2004); United States v. Banks, 340 F.3d 683, 684-85 (8th Cir. 2003); United States v. Ochao, 311 F.3d 1133, 1134-36 (9th Cir. 2002); United States v. Mendez-Zamora, 296 F.3d 1013, 1020 (10th Cir. 2002); United States v. Ortiz, 318 F.3d 1030, 1039 (11th Cir. 2003); United States v. Pettigrew, 346 F.3d 1139, n.18 (D.C. Cir. 2003).

Even if Blakely were subsequently applied to the federal sentencing guidelines, counsel could not be held ineffective for failing to anticipate this subsequent development in the law. See Lucas v. Johnson, 132 F.3d 1069, 1078 (5th Cir. 1998) (holding "counsel is not required to anticipate subsequent developments in the law.") Nor would this new procedural rule, which as stated above goes against the current law in this circuit, be of the type to be applied retroactively.

23

## II.    Counsel Did Not Mislead the Defendant as to the Maximum Penalty or Force Him to Trial.

In claiming that his counsel erroneously explained that he was only facing a maximum statutory penalty of five years, Richmond attaches as an exhibit the first page of a letter written to him by his counsel. The second page, however, reveals that defendant has misrepresented his counsel's statements. On page 2, defendant is specifically told that the government would be superseding the charges to include an access device fraud which carried a maximum imprisonment term of up to "20 years." (Attachment I, p.2). As of November 21, 2000, defendant Richmond knew of the government's position to supersede the indictment and the statutory penalties that he faced.

Richmond attempts to manufacture a Fifth Amendment argument to suggest that his counsel refused to allow him to enter a plea of guilty. The government would have rejected any plea proposal. Richmond was a recidivist, a dangerous criminal and one who had orchestrated the murder of a co-conspirator. The government had every intention of convicting the defendant and then seeking a substantial upward departure in the sentence which it did. Richmond was well aware of the government's position in this case. Ironically, Richmond engages in misrepresentation and conceals page 2 of the letter to bolster a bogus claim that his counsel made misrepresentations. But in his desperation, he makes an admission that undercuts his entire "ineffective assistance" argument. By acknowledging a desire to plead guilty, he concedes that he was guilty of the charged offenses. No conduct of any counsel , therefore, rendered the proceedings "fundamentally unfair."

24

### III.    Counsel Was Not Ineffective in Not Requesting an Evidentiary Hearing to Resolve Defendant's Motion for a New Trial for Alleged False Testimony

The motion for a new trial ordinarily may be decided without an evidentiary hearing, United States v. Simmons, 714 F.2d 29, 30-31 (5th Cir. 1983), and the decision to hold a hearing rests with the sound discretion of the trial court. United States v. Blackburn, 9 F.3d 353, 358 (5th Cir.1993).

Though the Fifth Circuit Court of Appeals found that no request had been made for an evidentiary hearing, the court ultimately ruled on the merits of the new trial motion, concluding that the district court was correct in determining that Carey's testimony was exculpatory, not inculpatory, and that Richmond could not show that "he would probably have been acquitted on this charge without Carey's testimony."  5th Cir. Opin. 8, 10-11. No evidentiary hearing could change that fact or alter the statement in Carey's letter that she had disrupted the government's case.

An evidentiary hearing would have only served to highlight the defendant's obstruction of justice efforts in causing Carey's two sisters to be threatened and Carey to be bribed in an effort to prevent her incriminating testimony.   The government had submitted the affidavits of Carey's two sisters and evidence of the payments made to Carey's commissary account at the Orleans Parish Prison to establish the extortion and bribe plot by Richmond.  4 R30236, 569, 576, 590.  See Gov't Appeal Brief, pp.  30-36.

### IV.    Defendants Due Process Rights Were Not Violated by the Prosecutor's Alleged Failure to Correct "False" Testimony

The government's response to Issue III applies equally here.  First, any allegedly "false" testimony was exculpatory, not inculpatory, as a result of Richmond's criminal efforts.  Second, as highlighted in the government's appeal brief, the prosecutor did all in his power to question the witness to elicit the truth.  Gov't.  Appeal Br.  pp.31-34.  At no

25

point during the course of the proceedings, did the government ever try to take advantage of any "false" testimony to convict the defendant, nor did Richmond provide any contrary information.

Due process violations arise when a prosecutor in bad faith suborns perjury or fails to correct perjury that was material to the conviction of the defendant. Napue v. Illinois, 360 U.S. 264, 269 (1959). Such circumstances did not occur to Richmond.

**V.-VIII.    Counsel Was Not Ineffective at Trial For: *V.* Failing to Require an on the Record Beechum Analysis by the District Court; *VI.* Failing to Object to the Use of Rule 404(b) Evidence as to the Substantive Charges; *VII.* Failing to Remove Knowledge and Intent as an Issue to Avoid Admission of Rule 404(b) Evidence; or *VIII.* Failing on Appeal to Argue Specifically Against the Admission of Rule 404(b) Evidence as to the Substantive Offenses and the Providing of the Limiting Instructions**

Responding to issues V, VI and VIII, while trial and appellate counsel urged that the Rule 404(b) evidence was not admissible as to any charged offense, both the district court and the appellate court concluded that the two prior convictions were admissible pursuant to Rule 404(b) as to all charged offenses and that the district court properly administered the Beechum test. 5th Cir. Opin.12-14. "These early offenses have a tendency to show that Richmond had knowledge and intent to commit fraud in this case." Richmond's attempt to argue ineffectiveness for not limiting the Rule 404(b) opposition to just the "substantive offenses" thus fails on the merits. The courts found the extrinsic evidence applicable to all charged offenses.

In Issue V, defendant's rights would not have been affected by any failure by the district court to make an on-the-record Beechum analysis because, in response to the defense's pretrial in limine motions, the court already specifically applied that test, concluding that the two-prong test had been met and that the convictions were admissible. The Fifth Circuit noted: "The trial court clearly refers to the Beechum test in its order and

reasons, and found that the probative value was strong enough to allow admission of the evidence." 5th Cir. Opin. 12-13.

As to Issues VI and VIII, neither trial nor appellate counsel were ineffective in failing to urge the inadmissibility of Rule 404(b) as it relates to the substantive offenses since they both did so by claiming that the "other crime evidence" was inadmissible as to all charged offenses. On appeal, defense counsel tried to convince the court that no defense was raised, but the record belied such an argument. Not only were "mere presence" instructions given at the request of the defense, but through cross-examination of government witnesses and closing argument, the defense had to attempt to counter the testimony of nine accomplices who testified about Richmond's leadership role in the overarching conspiracy. The defense had no choice but to argue that the defendant had no knowledge of or intent to commit those activities testified to by the government witnesses and was innocently present at the scene of his arrest. See RBr. 13-18, Gov't Appeal Br., pp. 37-45.

Richmond's contention in Issue VII that counsel should have "removed" Richmond's knowledge and intent to commit the charged offenses as issues in the trial to prevent the admission of Rule 404(b) evidence is preposterous. This argument amplifies the "any port in a storm" approach. Because defendant was caught red-handed stealing the mail from the post office, his counsel's concession of defendant's knowledge and criminal intent would have been a confession by counsel of their client's guilt. That sort of advocacy would meet the "ineffective assistance" threshold. Richmond's argument once again emphasizes the propriety of the verdict and the frivolity of the claim that his counsel denied him "effective assistance."

## IX.    Defendant Suffered No Harm by the the "In and Itself" Language in the "Accomplice" Jury Instruction Provided by the Court.

At the time of the trial, the language "in and itself" was incorporated in the *Pattern Fifth Circuit Jury Instructions*, Section 1.15. That instruction had been approved in United States v. Pettigrew, 77 F.3d 1500, 1518 (5th Cir. 1996) .

There was no suggestion at trial that the accomplices had plead to the conspiracy in which defendant was charged since the indictment against Richmond had been redacted to remove the names of all codefendants not on trial. Nor at any time did the prosecution argue that the defendant was guilty because the accomplices had plead to the same conspiracy in which he was charged. Richmond cannot show that the inclusion of the disputed language in the instruction and counsel's failure to object to its inclusion caused a fundamentally unfair outcome to the proceedings.

## X.    Counsel had No Legal Basis for Objecting to Defendant's Leadership Role Enhancement

The defense did object to the court's finding of an organizer and leadership role pursuant to U.S.S.G. § 3B1.1 but in the face of overwhelming evidence adduced at trial and during the sentencing hearing, the court properly applied the enhancement. The overall scheme was set forth in the conspiracy charged in the indictment. Defendant was charged both as a conspirator and as a principal in the substantive offenses that applied to him. The fact that an 18 U.S.C. § 2 charge was included in no way undermines the factual showing that defendant was the leader and/or organizer of five or more people engaged in a scheme to defraud or was a leader and/or organizer of a criminal scheme that was otherwise extensive. Richmond provides this Court with no case law that invalidates a role enhancement where a defendant has been charged as a conspirator, and

28

a principal in the substantive offenses, when an aiding and abetting charge is also included.

## XI.    Counsel Had No Legal Basis For Urging That the Section 371 General Conspiracy and the Substantive Offenses (Underlying Objectives of the Conspiracy) Were Both Multiplicitious and in Violation of the Double Jeopardy Clause

Richmond simply ignores the longstanding case law that a Section 371 general conspiracy can be charged along with substantive offenses that relate to the underlying principal objectives of that conspiracy without offending the double jeopardy clause or creating multiplicitious charges. As recognized in the Callanan v. United States, 364 U.S. 587, 593 (1961).

> The distinctiveness between a substantive offense and a conspiracy to commit is a postulate of our law. 'It has been long and consistently recognized by the court that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses.' Pinkerton v. United States, 328 U.S. 640, 643 (further citations omitted.) See also Pereira v. United States, 347 U.S. 1, 11 (further citations omitted.)

See also United States v. Harrelson, 754 F.2d 1182, 1185 (5th Cir. 1985). Counsels' refusal to urge an erroneous legal position was not "ineffectiveness assistance."

## XII.    Defendant's Cumulative Error Argument Cannot Prevail

Richmond can show no deficiency by his counsel, and he cannot demonstrate that any reputed deficiency would have resulted in a fundamentally unfair outcome to the proceedings. His acknowledgment of guilt in Issues II and VII run counter to his claims. Though defendant casts about to create an "ineffective assistance" position, he cannot rebut the overwhelming evidence in the record that supports his conviction, the sentencing enhancements found, and the upward departure granted. Because Blakely cannot be applied retroactively and has not been found by this circuit to apply to the federal

29

sentencing guidelines, defendant has provided this Court with no basis for vacating his conviction and his request should be denied.

Respectfully submitted,

JIM LETTEN
UNITED STATES ATTORNEY

HARRY W. MCSHERRY, JR. (9388)
Assistant United States Attorney
Hale Boggs Federal Building
500 Poydras Street, Room B-210
New Orleans, Louisiana 70130
Tel: (504) 680-3012

CERTIFICATE OF SERVICE
i certify that a copy of the
foregoing has been served upon
counsel for all parties
by mailing the same to each,
properly addressed and postage
prepaid this _____ day of
_____, 20___.

Assistant United States Attorney

# FEDERAL PUBLIC DEFENDER
### EASTERN DISTRICT OF LOUISIANA
HALE BOGGS FEDERAL BUILDING
501 MAGAZINE STREET, SUITE 318
## NEW ORLEANS, LOUISIANA 70130

Virginia L. Schlueter
   Federal Public Defender
Robert F. Barnard
John Harvey Craft
Roma A. Kent
Gary V. Schwabe, Jr.
Valerie Welz Jusselin
Ronald C. Small
   Assistant Federal Public Defenders

TOLL FREE  1-(800) 296-4046
TELEPHONE  (504) 589-7930
FAX   (504) 589-2556

November 21, 2000

Mr. Kenneth Richmond
Folder No.36512
TPIII E-3
3000 Perdido Street
New Orleans, Louisiana 70119

Re:   **USA v. Kenneth Richmond**
      **U.S.D.C. No. 00-321 "N"(4)**

Dear Kenneth:

This date, I met with Mr. Nathan Lewis, Special Assistant United States Attorney and Postal Inspectors, including M.C. Winston, to review discovery materials pertaining to your case. There were two other Postal Inspectors present at this meeting in addition to Mr. Winston.

The Postal Inspectors essentially discussed evidence that they have with respect to other allegations involving credit card, stolen and counterfeited checks and postal theft. The Postal Inspectors indicated that they have evidence of approximately $450,000.00 in personal checks which were allegedly taken out of the mail and endorsed by various individuals who are alleged to be working with you. Further, the government alleges that the credit card numbers were taken out of the mail and used to manufacture fraudulent credit cards which were used to obtain cash advances. They claim that a man called "the Teacher" assisted in setting up the credit card scam. The government contends that there are several individuals who were arrested in connection with this alleged fraudulent scheme, who have made statements implicating you. They have alleged that there are approximately 124 fraudulent credit cards involved with losses totaling in the neighborhood of one million dollars. I have enclosed a copy of the ledger prepared by the Postal Inspectors which summarizes the names of the alleged victims and the banks and/or financial institutions involved as well as a list of victims referencing Honey Carey as a suspect. The Postal Inspectors have told me that Ms. Carey has implicated you as the organizer of this fraudulent scheme.

We also discussed the pending indictment against you. The government made a great deal out of the total amount of the money which could be used as "relevant conduct" in sentencing, even though it was not charged in the indictment. However, I reminded them that no matter how much your guideline range may be or what relevant conduct they could include, you face a maximum of five (5) years imprisonment under the statute. The government then indicated that based on the number of alleged victims and the possibility of other charges, they would seek to supercede the indictment. In sum, Mr. Lewis has indicated that he intends to pursue a superceding indictment for *Fraud and*

Mr. Kenneth Richmond
November 21, 2000
Page 2

*Related Activity in Connection With Access Devices* in violation of Title 18 United States Code, Section 1029. The maximum possible term of imprisonment is up to twenty years. The government has not indicated when they would pursue the superceding indictment.

There are other things that I need to discuss with you in person, rather than in this letter. For now, in light of the late discovery and the government's intent to seek other charges against you, I filed a motion to continue the trial and pretrial conference. I have enclosed a copy of this motion enclosed for your review. The government has indicated that they will provide the requested discovery to me no later than Tuesday, November 28, 2000. Once I receive the materials, I will schedule a time to come meet with you so that we may review the items together. I have requested verbally (and will confirm in writing) that the government will provide me with all information relevant to any charges which they intend to seek a superceding indictment. I have also enclosed a transcript of the September 29, 2000 conversation between you and Yvette Jones. My initial review of this conversation does not appear to be real incriminating.

Kenneth, please be assured that I am doing everything possible to represent your interests in this matter. I will continue to keep you advised of all facets of your case and advise you of any new developments as they occur. Please feel free to contact me at anytime if you have any questions, comments or concerns.

With kindest personal regards, I am

Sincerely,

RONALD C. SMALL
Assistant Federal Public Defender

Enclosures